1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARC ANTHONY MENDOZA,                No. 1:18-cv-01048-AWI-SKO (HC)

12              Petitioner,               **FINDINGS AND RECOMMENDATION
                                          TO DENY PETITION FOR WRIT OF**
13        v.                              **HABEAS CORPUS**

14   JOE LIZARRAGA,                       **[TWENTY-ONE DAY OBJECTION
                                          DEADLINE]**
15              Respondent.

16

17        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  He is currently serving a sentence of life without possibility of

19   parole for his conviction of several offenses including first-degree special-circumstance murder.

20   He filed the instant habeas action challenging the conviction. As discussed below, the Court finds

21   the claims to be without merit and recommends the petition be **DENIED.**

22   **I.      PROCEDURAL HISTORY**

23        On February 28, 2013, a Kern County jury found Petitioner guilty of first-degree

24   premeditated murder with personal use of a firearm, discharging a firearm at a person from a

25   motor vehicle, being a felon in possession of a firearm, being a felon in possession of

26   ammunition, and actively participating in a criminal street gang. See People v. Mendoza, No.

27   F067023, 2015 WL 3399162, at *2 (Cal. Ct. App. May 27, 2015). The jury also found Petitioner

28   guilty of numerous enhancements. Id.

                                            1

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On May 27, 2015, the Fifth DCA reversed the conviction for active participation in a criminal street gang and the gang enhancements on counts three and four. (Doc. 17-24 at 25.) The appellate court remanded the matter to the superior court for resentencing. Petitioner filed a petition for review in the California Supreme Court, and the petition was denied on August 25, 2015. Id. at *1.

On remand, the Kern County Superior Court resentenced Petitioner as follows:

On count 1, first degree premeditated murder with special circumstances (§§ 187, subd. (a), 189, 190.2, subd. (a)(21) & (a)(22)), the court imposed the term of life without the possibility of parole, plus enhancements of 25 years to life (§ 12022.53, subd. (d), discharging a firearm and causing death), 10 years (two true findings under § 667, subd. (a), prior serious felony), and one year (§ 667.5, subd. (b), prior prison term). On counts 2 and 3, discharging a firearm at a person from a motor vehicle (former § 12034, subd. (c)) and being a felon in possession of a firearm (former § 12021, subd. (a)(1)), the court imposed sentences and stayed them pursuant to section 654. On count 4, being a felon in possession of ammunition (former § 12316, subd. (b)(1)), the court imposed a sentence of six years, plus enhancements of three years (three true findings under § 667.5, subd. (b), prior prison term), to be served consecutive to count 1. The total unstayed sentence thus was life without the possibility of parole, plus 25 years to life, plus 20 years.

(Doc. 17-32 at 5-6.)

Petitioner then filed another direct appeal to the Fifth DCA. On January 26, 2017, the Fifth DCA affirmed the judgment. (Doc. 17-32.) Petitioner next filed a petition for review in the California Supreme Court. The petition was denied on April 12, 2017. (Doc. 17-34.)

On April 24, 2018, Petitioner filed the instant petition for writ of habeas corpus. (Doc. 1.) Respondent filed an answer on December 11, 2018. (Doc. 16.) Petitioner did not file a traverse.

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

At a Bakersfield bar called Stella's Sandtrap, sheriff's deputies and an ambulance arrived in response to a reported shooting around 1:50 a.m. on August 21, 2011. They found Roman Fernandez lying in the parking lot with a gunshot wound to his chest, not breathing, and with no pulse. Fernandez was taken to a hospital, where he

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will adopt the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

was pronounced dead at 2:12 a.m. An autopsy showed that he was killed by a single shot that entered the left side of his chest, exited near his right armpit, and damaged his heart, liver, diaphragm, and right lung.

[…]

At trial, two witnesses testified that they were in a pickup truck with Mendoza when Mendoza fired a gun through the window at Fernandez. These witnesses were Gabriel Ramirez (we will refer to Gabriel and Sandra Ramirez by their first names to avoid confusion) and Mark Mendoza, Jr. Mark Mendoza, Jr., is Mendoza's son. (To avoid confusion, we will refer to him as Mark, Jr.) Gabriel is a cousin of Mark, Jr.'s, girlfriend. Gabriel testified that at closing time, at the end of a night of drinking at Stella's Sandtrap, he, Mark, Jr., and Mendoza got into a four-door truck. Mendoza was in the right front seat, Gabriel was in the right rear seat, and Mark, Jr., was the driver. The truck began to back up, and a Hispanic man with tattoos on his face walked up to it on the passenger side. When the man was within a few feet of the truck, Gabriel leaned back to go to sleep. His window was open. He heard a loud pop that made his ears ring. He saw a flash and heard the man outside the truck scream. Then he saw a gun, held by Mendoza, pointing out the right front window. A rag was covering Mendoza's hands. Mendoza brought his hands back inside and the truck sped away. They drove to the home of Eva Soto, who at the time of trial was Mendoza's fiancée. (Gabriel thought it was Mendoza's house, but Soto testified that Mendoza was not living there.)

Mark, Jr., testified that he, his father, and Gabriel got into the truck to leave Stella's Sandtrap. Mark, Jr., who had had three or four beers, was driving. Mendoza was in the front passenger seat, and Gabriel was behind Mendoza in the right rear seat. As they got in, Mendoza said he wanted to fight Roman Fernandez because of an incident earlier in the evening (described in more detail below) between Gabriel and a woman who was part of a group that included Fernandez. Mark, Jr., pleaded with Mendoza to just come home. Mark, Jr., backed the truck out of its parking space and then stopped, because he thought Mendoza was about to get out and fight. Instead, Mark, Jr., heard a pop and saw a flash on his right, where Mendoza was sitting. Mark, Jr., did not see a gun, but he saw Mendoza drawing his hands, which were covered with a shirt, back into the truck through the window. Mark, Jr., was convinced Mendoza had shot someone, but he admitted he did not see it happening. Gabriel's window was closed. Mark, Jr., drove to Soto's house.

The jury was shown video footage taken by a surveillance camera aimed at the parking lot of Stella's Sandtrap. The video is dark, and the events in question take place a considerable distance from the camera, toward the back of the parking lot. A pickup truck can be seen backing out of a parking space and then stopping. The right rear door opens, someone gets in, and the door closes. Then another person walks up to the truck on the passenger side. Bystanders suddenly look or move toward the truck. The truck pulls away quickly and a person falls to the ground.

Several witnesses at trial described events that led up to the shooting. Rosemary Delarosa, who was Mark, Jr.'s, girlfriend, testified that she went to Stella's Sandtrap on the night of the shooting with Mark, Jr., Gabriel, and Sandra Ramirez. Gabriel and Sandra were siblings; they were also cousins of Delarosa. They arrived around 10:00 p.m. Mendoza and Soto joined them about 20 minutes later. Delarosa got drunk. Around midnight, a woman threw a pitcher of beer at the group. At the time, Delarosa did not know what prompted the woman to do this. At closing time, the six companions left the bar together. The men got in Delarosa's truck and the women in Soto's car. Mendoza told Delarosa to ride in Soto's car.

Gabriel, in his testimony, explained why the beer was thrown. While drunk, he tapped a woman on the rear end with his foot "to get her attention." She became angry and threw the beer. Delarosa and Sandra argued with the woman who threw the beer. Fifteen or 20 minutes later, Delarosa and Sandra persuaded Gabriel that he ought to leave. Mark, Jr., and Sandra drove him to Sandra's house. When they got there, however, Gabriel decided he was being wrongly punished when he had not done anything wrong; he insisted on going back. When he got back, a man approached him and asked in a "weird" way who he was. The man was Hispanic and had tattoos on his face.

Mark, Jr., testified that Mendoza told him Roman Fernandez had been talking with the woman who threw the beer. Mendoza told Mark, Jr., he wanted to fight Fernandez.

Eva Soto testified that the woman whom Gabriel tapped with his foot was with some men, one of whom had "Colonia" tattooed on his face. The Colonia Bakers are a criminal street gang in Bakersfield. Soto's boyfriend, had many tattoos on his body, including some saying "Varrio." The Varrio Bakers are another criminal street gang in Bakersfield. Soto had been with Mendoza for 18 years and had not seen any new tattoos on him during the last 10 years. Mendoza was diagnosed with leukemia in 2007 and was receiving chemotherapy.

At closing time, Soto left in her car with Delarosa and Sandra. She was drunk. They stopped at a supermarket to get more beer, then drove to Soto's house.

Sandra testified that she, too, was drunk at Stella's Sandtrap on the night of the shooting. She also described leaving the bar in Soto's car with Soto and Delarosa, buying beer, and proceeding to Soto's house.

Daniel Garduno, a customer at Stella's Sandtrap on the night of the shooting, testified about interactions he had with Mendoza there. Garduno said he was a former member of the Varrio Bakers and had agreed to testify in exchange for the dismissal of pending charges. He had the letters VB tattooed on his face and other gang tattoos elsewhere on his body. He also said he had terminal cancer of the spine and had been told shortly before the time of trial that he had six to eight months to live.

Garduno testified that, as he stood at the bar, played pool and danced, he was approached a number of times by a man who had a tattoo on his forehead labeling him a member of the rival Colonia Bakers gang. The man was called Negro and he asked Garduno if he knew where he was and whether he was comfortable. Stella's Sandtrap was in Colonia Bakers territory, according to Garduno. Garduno understood Negro to be expressing disrespect to him as a rival, but Garduno did not react, since he was no longer an active Varrio Bakers member. Garduno did tell Negro he was from the Varrio Bakers, however.

Mendoza also approached Garduno at Stella's Sandtrap and introduced himself as Huero from Varrio Bakers. They shook hands and Garduno felt comfortable knowing a Varrio Bakers member was present. Later, Mendoza approached again, upset, and told Garduno some men were "rubbing on his wife's friends." Mendoza pointed the men out to Garduno. They were Colonia Bakers members. Garduno told Mendoza not to worry. He said, "If they start tripping, I'm right here." "Tripping" meant acting out or behaving disrespectfully. As he was leaving for the night, Garduno saw Mendoza again. Mendoza asked Garduno if he was leaving. Garduno

said yes. Mendoza said, "[W]ell, I got the fuska," which was a term for a gun. He showed the gun to Garduno. Garduno asked whether Mendoza had the gun because "[t]hese fools are still tripping." Mendoza said yes. Garduno said he would remain, but he did not. Garduno was concerned that someone might have told Mendoza that Garduno was a gang dropout and that Mendoza might use the gun on Garduno.

The jury was shown another surveillance video from the parking lot of Stella's Sandtrap. Garduno identified one man in the video as himself and another as Mendoza. Mendoza and Garduno face one another briefly and Mendoza quickly removes a hand from his pants pocket and puts it back in. Garduno testified that the video showed the moment when Mendoza revealed the gun. The gun is not visible in the video. Delarosa testified that she remembered seeing Mendoza speaking with a man who had a tattoo on his face.

Mendoza's five companions also testified about events following the shooting. Gabriel testified that he, Mendoza, and Mark, Jr., drove to Soto's house and that the three women arrived there also. Gabriel did not speak with any of them about the shooting. Mendoza "had told me to keep my mouth shut or he would peel my cap back, too," Gabriel testified. Gabriel took this to mean Mendoza would shoot him. Gabriel left the house and did not speak to Mendoza again. Three days later, someone in a car followed Gabriel and his daughter to church. Gabriel was afraid, so when he got inside, he asked the pastor for the phone number of a police officer who attended the church. From the officer, he learned that it was sheriff's deputies who had followed him. Gabriel decided to tell the story of the shooting to the deputies. At his own request, Gabriel was placed in the witness-protection program.

Mark, Jr., testified that after he heard the shot and began driving away, he asked his father what had happened. Mendoza told him just to keep driving. When they arrived at Soto's house, Mendoza went into the garage and came back out after about five minutes. Later, on the patio, Mark, Jr., heard Mendoza and Gabriel arguing about something Gabriel had said to Soto. Mendoza told Gabriel to be quiet. Mark, Jr., discussed the shooting with Mendoza, Delarosa, Gabriel, and Sandra.

Mark, Jr., was arrested as a suspect in the shooting. He was held for four days, during which he did not tell police what he had seen. A week after being released, he went to the police and told them his father shot Fernandez. He was not promised that he would not be charged.

Delarosa testified that as she, Soto, and Sandra were driving away from Stella's Sandtrap at closing time and heading for the supermarket to buy beer, she heard a pop like a firecracker. She could not tell where it came from. When they got to Soto's house, Mark, Jr., and Gabriel did not tell her anything about what happened. Mark, Jr., cried and said she did not need to know and it was none of her business. He did, however, tell her he heard a shot and his ear was ringing. Later, after being released from custody, Mark, Jr., finally told Delarosa that Mendoza shot someone.

Sandra testified that, after they all arrived at Soto's house after leaving Stella's Sandtrap, she heard Mendoza arguing with Gabriel. Mendoza "told my brother Gabriel I should split your wig like I did to the other fool." Mendoza also said "that when he shot the guy, he shot him from the side, that he barely missed him."

Eva Soto testified that when she and the others came to her house after leaving Stella's Sandtrap, there was an argument, but it had nothing to do with the shooting. She argued with Gabriel over Gabriel's "disrespectful," "obnoxious," and "out of control" drunken behavior. She did not hear Mendoza threatening anyone. Soto did

not know about the shooting at all that night.

The prosecution presented evidence about the discovery of a gun and some ammunition in Soto's house. Detective James Newell testified that he searched Soto's garage and found a .380–caliber Bersa handgun among some clothes in a cardboard box. Seventeen bullets of a different caliber (.22) were found in the same place. Soto testified that the gun did not belong to her or her children, and she did not know to whom it belonged. Ramon Gallardo Garcia, a resident of Arvin, testified that the same gun was stolen from his house in June 2010. A criminalist testified that he tested swabs taken from the gun for DNA and compared the results with a sample of DNA taken from Mendoza. DNA from the trigger had at least two contributors. One contributor had a profile shared by Mendoza which matched the profile of one in 5.4 million Hispanic people.

The prosecution played for the jury a recording of a telephone conversation between Mendoza and Soto that took place while Mendoza was in jail. During this conversation, Soto said, "Well they, they found the other gun out in Arvin and they found bullets that [Audi] got from her dad's house. Remember those ones? Where were those at?" "They were right there," Mendoza replied, "[w]ith the gun." Audi is Soto's daughter. Soto testified that Audi's father (who is not Mendoza) gave Audi the bullets that were found in the garage. Soto also testified that she referred to Arvin when describing the gun the officers found because one of the officers had said something about Arvin at the time of the search.

Officer Shane Shaff of the Bakersfield Police Department testified as an expert on criminal street gangs. He opined that the Varrio Bakers are a criminal street gang engaged in a pattern of criminal gang activity, with primary activities of narcotics sales, shootings, stabbings, murder, and auto theft. He based this opinion on his numerous contacts with and arrests of gang members in Bakersfield, including Varrio Bakers members. He also relied on several specific convictions of predicate offenses committed by Varrio Bakers members. The primary rivals of the Varrio Bakers are the Colonia Bakers and the Okie Bakers.

Shaff also opined that Mendoza was an active participant in the Varrio Bakers at the time of the shooting. For this opinion, Shaff relied on several factors: Garduno had testified that he and Mendoza were both Varrio Bakers members. Mark, Jr., said Mendoza was a member. There were five offense reports in which Mendoza was described as participating in offenses Shaff considered to be characteristic gang activities or in which Mendoza claimed to be a Varrio Bakers member. Mendoza had several gang tattoos on his chest, stomach, hand and legs, including some that referred specifically to the Varrio Bakers. Based on similar information, Shaff opined that Fernandez was a member of the Colonia Bakers at the time of the shooting.

The prosecutor asked Shaff the following question:

> "An active participant of the Varrio Bakers arrives at a bar that is within the Colonia Baker territory. While in that bar he leaves the bar and goes and locates a firearm, comes back and shows that firearm to another person he believes to be part of his same gang, the Varrio Bakers, 20 minutes prior to the shooting. The known active participant of the Varrio Bakers exits the bar with some family members, enters a vehicle, and upon a Colonia Baker coming alongside that vehicle shoots that Colonia Baker criminal street gang member.

"Do you have an opinion as to whether or not that incident is for the benefit of the Varrio Bakers criminal street gang?"

Shaff's opinion was that it was. He said the shooting would benefit the gang by boosting the reputation of the gang and the member and instill fear in rival gangs and the public.

Mendoza testified in his own defense. In his telling, the story of his night at Stella's Sandtrap was as follows: When he and Soto arrived, they sat down and the man he later learned was Roman Fernandez was sitting next to them. Fernandez had "Colonia" tattooed on his forehead. Later, near the pool tables, Soto saw a friend of hers who was with Garduno. They spoke to the friend, who introduced Garduno as Kiki. Garduno asked Mendoza if he was "from the Varrio." Mendoza said he "used to be."

At one point, Mendoza and Soto left the bar, drove to an ATM, and returned. In the parking lot, Mendoza saw and spoke with Garduno. Mendoza had some marijuana in his pocket. He showed it to Garduno and asked if Garduno wanted to smoke. Garduno said no. Mendoza did not have a gun and was not familiar with the term "fuska."

Back inside the bar, Gabriel, whom Mendoza did not know well, was talking with some women who were standing near Fernandez. Mendoza had to ask Mark, Jr., who Gabriel was, as he had met him only one time before and had forgotten him. Gabriel kicked one of the women in her rear end and the woman threw beer. Then the woman talked with Fernandez, who looked over at Gabriel and Mendoza. Mendoza went and spoke to Garduno. Mendoza said, "[H]ey, these guys over here are tripping about this guy over here. And, you know, that was it. I said if something cracks off, you know, would he fight."

At closing time, Mendoza and Mark, Jr., went out to the parking lot and got in the truck. Mark, Jr., was driving and Mendoza was in the front passenger seat. Mark, Jr., backed out of the parking space and then Gabriel walked up and Mark, Jr., stopped to let him get in the back seat. Mendoza took off his hat and shirt. He was sitting in his undershirt and preparing to fasten his seatbelt when he heard a gunshot from behind. He did not see what happened. He did not know if they were being shot at. He told Mark, Jr., to drive away.

At Soto's house, Mendoza inspected the truck for bullet holes. Gabriel called someone on his phone.

Mendoza denied that he ever said he would peel anyone's cap back or split anyone's wig. When he and Soto referred to a gun during the recorded telephone call, they were talking about a BB gun that belonged to Soto's son. Mendoza admitted on cross-examination that he left some bullets in Soto's house. He said he put them with the BB gun.

Mendoza testified that, in the summer of 2011 before the shooting, he did laundry in Soto's garage and helped clean the garage. He authenticated a picture of himself holding a child in a blue shirt and said this was the same shirt that the gun was found with in the box in the garage. He had never seen the gun before.

Mendoza admitted that he had once been a Varrio Bakers gang member, but claimed he was one no longer. He said he dropped out in 1991.

Mendoza testified that when Mark, Jr., was a teenager, Mark, Jr., was part of a

"tagging crew" that was originally affiliated with the Varrio Bakers. Later the crew had a falling out with the Varrio Bakers and became affiliated with the Colonia Bakers.

In closing arguments, the prosecution's theory was that Mendoza murdered Fernandez because Fernandez was a member of a rival gang. The defense theory was that Gabriel killed Fernandez over the conflict arising from Gabriel's mistreatment of one of the women who were with Fernandez.

Mendoza, 2015 WL 3399162, at *1-7.

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.     Review of Petition

The petition presents the following claims for relief: 1) The trial court violated Petitioner's constitutional right to have every fact determined by the jury when it failed to *sua sponte* instruct that the jury must determine whether prosecution witnesses Mark Mendoza, Jr., and Gabriel Ramirez were accomplices within the meaning of section 1111; 2) The trial court violated Petitioner's due process rights when it denied his motion to try the gang allegations separately from the other charges and allegations; 3) The evidence was insufficient to support the jury findings made on enhancement allegations as to counts one and two, that those offenses were committed to benefit a criminal street gang; and 4) The sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment.

1.     Instructional Error

Petitioner first claims the jury should have been instructed on principles in Cal. Penal Code section 1111, concerning the status of prosecution witnesses Mark Mendoza, Jr., and Gabriel Ramirez as accomplices to the crimes charged in counts one and two. Petitioner raised this claim on direct appeal in the state courts. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Mendoza argues that the court erred when it failed to give, on its on [sic] motion, an instruction directing the jury to view the testimony of Gabriel and Mark, Jr., with caution, and not to convict Mendoza based on their testimony without corroboration, if they were accomplices in the killing of Fernandez. Mendoza does not claim he requested such an instruction.
>
> Section 1111 provides:
>
> "A conviction [cannot] be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

The substance of section 1111 has long been the law because of the dangers generally associated with accomplice testimony. "[I]t was, of course, recognized that evidence of an accomplice, coming from a tainted source, the witness being ... a man usually testifying in the hope of favor or the expectation of immunity, was not entitled to the same consideration as the evidence of a clean man, free from infamy." (*People v. Coffey* (1911) 161 Cal. 433, 438.)

To comply with section 1111, a trial court must, on its own motion, give the jury an appropriate instruction in any case in which there is sufficient evidence at trial that a witness is an accomplice. (*People v. Tobias* (2001) 25 Cal.4th 327, 331.) CALCRIM No. 334 is appropriate when it is a question of fact for the jury whether the witness is an accomplice, while CALCRIM No. 335 is appropriate if the court concludes as a matter of law, or the parties stipulate, that the witness is an accomplice. (See *People v. Hayes* (1999) 21 Cal.4th 1211, 1270–1271.)

In this case, there was no basis for the court to determine as a matter of law, and the parties did not stipulate, that Gabriel or Mark, Jr., were accomplices. We will assume for the sake of argument, however, that there was substantial evidence that would have supported a finding that Gabriel, at least, was an accomplice. It was open to the jury to believe Mendoza's testimony and conclude that Gabriel was the shooter.

The People argue that section 1111 does not apply if the evidence supports the view that the witness was a direct perpetrator rather than one who assists in the crime, but this is incorrect. (*People v. Fauber* (1992) 2 Cal.4th 792, 833–834 [accomplices for purposes of § 1111 are all those defined as principals by § 31, i.e., all direct perpetrators and all aiders and abettors].) The People also argue that the instruction was unnecessary because Mendoza's "theory" was that Gabriel was the *sole* perpetrator, not Mendoza's accomplice. The question, however, is not what Mendoza wanted the jury to find, but what the jury could reasonably find. We assume the jury could have accepted the proposition that Gabriel was the shooter but still rejected Mendoza's claim that he never had the gun and was uninvolved. Accordingly, we assume it was error not to instruct the jury with CALCRIM No. 334 or its equivalent.

It has been held that an erroneous failure to instruct on accomplice testimony in accordance with section 1111 is harmless if "there is sufficient corroborating evidence in the record." (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) This corroborating evidence "may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense." (*People v. Hayes, supra*, 21 Cal.4th at p. 1271.) The corroborating evidence is sufficient to show harmlessness if "it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." (*People v. Fauber, supra*, 2 Cal.4th at p. 834; see also *People v. Gonzales* (2011) 52 Cal.4th 254, 303 [relying on foregoing authorities].)

Sufficient corroborating evidence was presented at trial in this case. Sandra testified that she heard Mendoza admitting he fired a shot at Fernandez and threatening to do the same to Gabriel. Garduno testified that Mendoza solicited his assistance in an expected conflict with a group of Colonia Bakers and, in connection with this request, showed him a gun. Under the standard just described, no more than this was required. If the jury believed Sandra and Garduno, it could reasonably conclude that

Gabriel and Mark, Jr., were telling the truth and Mendoza was the shooter.
Mendoza argues that federal constitutional principles are at stake and therefore we should apply the harmless-error standard of *Chapman v. California* (1967) 386 U.S. 18, 24, 36; i.e., we should ask whether the error was harmless beyond a reasonable doubt. There is no authority for the proposition that federal constitutional principles are at stake when a court fails to instruct on accomplice testimony under section 1111. In fact, as Mendoza acknowledges, in *People v. Frye* (1998) 18 Cal.4th 894, 968–969, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22, our Supreme Court held that the federal Constitution is not involved in the question of whether it is proper to allocate to the defendant the burden of showing that a witness is an accomplice under section 1111. This is because the accomplice-testimony issue is unrelated to the prosecution's burden of proving the elements of the offense. Mendoza says Frye did not deal with a failure to give any instructions on the accomplice-testimony issue, and the federal Constitution was violated here because the "accomplice status of a prosecution witness is intertwined with proof of the defendant's guilt...." There is, however, no authority for the view that the federal Constitution is violated whenever a trial court's instructional error merely has *something* to do with proving guilt. A failure to give a section 1111 instruction is a state law error, and the *Chapman* standard does not apply.

Mendoza, 2015 WL 3399162, at *6–8.

a. Legal Standard and Analysis

Respondent correctly asserts that Petitioner fails to present a federal claim, since Petitioner is challenging the application and interpretation of state law. It is well-settled that federal habeas relief is not available to state prisoners challenging state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997) ("alleged errors in the application of state law are not cognizable in federal habeas corpus" proceedings). Although Petitioner attempts to claim a violation of his constitutional rights, he does not point to any federal authority which holds that the failure to give Cal. Penal Code § 1111 violated the Constitution. The requirement that § 1111 be given is a state law requirement. See Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000). There is no such requirement under the Constitution. As Respondent points out, "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them." Caminetti v. United States, 242 U.S. 470, 495 (1917). Thus, the claim is not cognizable on federal habeas and should be rejected.

Even if the Court found the claim cognizable, it would be without merit. A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious

effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but they are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146–47 (1998). In this case, Petitioner fails to show any prejudice. As noted by the appellate court, there was sufficient corroborating evidence presented at trial. A witness testified to overhearing Petitioner admitting he fired a shot at the victim and threatened to do the same to Gabriel. Another witness testified that Petitioner solicited his assistance with a rival group in case of conflict and showed him a gun.

Accordingly, the claim fails to present a cognizable federal claim. Moreover, Petitioner fails to establish that the state court's determination was contrary to or an unreasonable application of Supreme Court authority.  The claim should be denied.

### 2. Severance and Bifurcation

Petitioner next alleges the trial court violated his constitutional rights by refusing Petitioner's motion to bifurcate the trial on the gang count and enhancement allegations. This claim was also presented on direct appeal. The Fifth DCA rejected the claim as follows:

*A. Bifurcation*

Mendoza made a motion to bifurcate the trial so that the evidence supporting the gang special circumstance and the enhancements on counts 1 through 4 could be presented separately and not bias the jury on the question of guilt. The court denied the motion, stating that the gang evidence was admissible on the issue of guilt because the jury could find that Mendoza's gang membership was the motive for the killing and helped to show his intent. Mendoza now argues that the denial of the motion was incorrect. We review the ruling for abuse of discretion. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).)

Under section 1044, which vests discretion in the trial court to control the conduct of a criminal trial, a trial court is authorized to bifurcate a trial so that prior convictions or gang enhancements are not presented to the jury until after the jury has made a determination of guilt. (*Hernandez, supra*, 33 Cal.4th at pp. 1048–1049.) In the case of gang enhancement, bifurcation may be necessary because some of the evidence relevant to a gang-enhancement allegation, such as predicate prior offenses committed by the defendant, may be unduly prejudicial. (*Id*. at p. 1049.) At the same time, however, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation— including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other

13

issues pertinent to guilt of the charged crime." (*Ibid*.) Under such circumstances, denial of bifurcation would be appropriate. (*Id*. at pp. 1049–1050.) Further, in a gang-enhancement case, bifurcation can properly be denied even when gang-related evidence is presented that, absent a gang enhancement, would have been found substantially more prejudicial than probative and thus inadmissible under Evidence Code section 352. Countervailing considerations, such as conservation of funds and judicial resources, can prevail over a defendant's showing of potential prejudice under these circumstances. (*Hernandez, supra*, at p. 1050.) For this reason, "the trial court's discretion to deny bifurcation of a charged gang enhancement is ... broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Ibid*.)

We agree with the People's view that this is a case in which denial of a bifurcation request was appropriate because the gang evidence was sufficiently probative of guilt, since it demonstrated Mendoza's motive and intent. The evidence indicated that, after his friends had a conflict with someone associated with a gang rival, Mendoza formed a plan to take revenge on that rival and retrieved a gun to carry it out. Mendoza made his intentions known to a fellow Varrio Baker who happened to be present, showing the fellow member his gun and explaining why he had it. Officer Shaff's testimony helped the jury understand the significance of a Varrio Baker's act of retaliatory violence against a Colonia Baker in Colonia Baker territory. This act would reinforce the reputation of the gang and member as a menace to rivals.

Even if some of the gang evidence would have been inadmissible had gang enhancements not been charged, "the countervailing considerations that apply when the enhancement is charged permitted a unitary trial." (*Hernandez, supra*, 33 Cal.4th at p. 1051.) Given the relevance of Mendoza's gang membership to the question of guilt, we see nothing in the record that was so unduly prejudicial that the expense and delay of a bifurcated trial for the gang allegations were still necessary. There was no abuse of discretion.

Mendoza also contends that the refusal to bifurcate violated federal due-process principles because the gang evidence was highly inflammatory and grossly unfair. (See, e.g., *People v. Arias* (1996) 13 Cal.4th 92, 127 [due process denied if joinder of counts results in gross unfairness].) We disagree. The gang evidence undoubtedly was damaging to Mendoza, but because it was closely intertwined with the proof of his guilt, the presentation of it to a jury determining his guilt was not unfair.

*B. Severance*

Mendoza did not ask the trial court to sever count 5, the gang-participation offense, for a separate trial. He now contends we should interpret his bifurcation request as impliedly including a severance request, which the court erroneously denied when it denied the bifurcation motion, or else hold that trial counsel was constitutionally ineffective when he did not make a request for severance. We will assume for the sake of argument that the bifurcation request was sufficient to preserve the issue for appeal and thus will analyze the issue directly, rather than applying an ineffective-assistance analysis. We review a ruling on a motion for severance for abuse of discretion. (*People v. Marshall* (1997) 15 Cal.4th 1, 27–28.) Cross-admissibility of the evidence from one trial in the other trial ordinarily renders severance unnecessary. (*Ibid*.)

Failing to sever count 5 was not an abuse of discretion because, as discussed above, it was proper not to bifurcate the gang enhancements for counts 1 through 4, and essentially the same evidence was relevant to count 5 as was relevant to the

enhancements. The gang-enhancement statute (§ 186.22, subd. (b)) and the gang-participation-offense statute (§ 186.22, subd. (a)) have somewhat different elements, but we see little or nothing in the record in this case that was admissible to prove the offense that was not also admissible to prove the enhancements. In other words, essentially all the gang evidence was cross-admissible. Because the jury properly would have heard the evidence relevant to count 5 in a trial limited to counts 1 through 4, severance of count 5 would not have protected any interest of Mendoza's, and the court consequently had discretion to deny severance.

Mendoza, 2015 WL 3399162, at *8-9.

        a. <u>Legal Standard and Analysis</u>

     There is no clearly established Federal law which holds that joinder or consolidation of charges or sentencing enhancements may violate the Constitution. In <u>United States v. Lane</u>, 474 U.S. 438, 446 n. 8 (1986), the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." However, in <u>Young v. Pliler</u>, the Ninth Circuit stated:

> <u>Lane</u> considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and expressly stated that no constitutional claim had been presented. <u>See Lane</u>, 474 U.S. 438, 446 & n. 9, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Thus, <u>Lane</u>'s broad statement-found in a footnote without citation to any legal authority-that misjoinder could only rise to the level of a constitutional violation if it was so prejudicial as to violate due process, was probably dictum. Only Supreme Court holdings are controlling when reviewing state court holdings under 28 U.S.C. § 2254; Court dicta and circuit court authority may not provide the basis for granting habeas relief. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

<u>Young</u>, 273 Fed.Appx. 670, n. 1, 2008 WL 1757564 (9th Cir.2008) (unpublished); <u>see also</u> <u>Collins v. Runnels</u>, 603 F.3d 1127, 1132–33 (9th Cir.2010).

     In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Williams</u>, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>. Given that there is no clearly established Federal law in this instance, the Court cannot grant relief, since habeas relief is triggered only when the state court adjudication runs afoul of clearly established federal law. <u>See</u>

Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (absent a Supreme Court decision that

squarely addresses the issue it "cannot be said, under AEDPA, there is 'clearly established'

Supreme Court precedent…and so we must defer to the state court's decision"). Thus, the claim

should be denied.

### 3. Insufficiency of the Evidence

Next, Petitioner claims the evidence was insufficient to support the jury findings as to the

enhancements to counts one and two, that those offenses were committed to benefit a criminal

street gang. This claim was also raised on direct appeal in the state courts. The Fifth DCA denied

the claim as follows:

> Mendoza contends that the evidence was insufficient to support the true findings on
> the gang enhancements imposed on counts 1 through 4 under section 186.22,
> subdivision (b). Section 186.22, subdivision (b), provides a sentence enhancement
> for "any person who is convicted of a felony committed for the benefit of, at the
> direction of, or in association with any criminal street gang, with the specific intent
> to promote, further, or assist in any criminal conduct by gang members...." [Fn.2.]
> Mendoza also claims the evidence was insufficient to support the true finding on the
> gang special circumstance alleged under section 190.2, subdivision (a)(22), in
> connection with count 1. Section 190.2, subdivision (a)(22), requires a finding that
> the defendant killed the victim intentionally while the defendant was an active
> participant in a criminal street gang and that the murder was committed to further
> the activities of the gang.

>> [Fn.2.] The language "promote ... any criminal conduct by gang members"
>> is similar to language in section 186.22, subdivision (a), the gang-
>> participation offense statute. In Rodriguez, as indicated above, our Supreme
>> Court held that the reference to "members" in section 186.22, subdivision
>> (a), means the defendant must have acted in concert with another gang
>> member. The Rodriguez court also specifically stated, however, that there is
>> no such requirement for a true finding under section 186.22, subdivision (b),
>> despite the similarity of the language. (Rodriguez, supra, 55 Cal.4th at pp.
>> 1138–1139.)

> When considering a challenge to the sufficiency of the evidence to support a
> judgment, we review the record in the light most favorable to the judgment and
> decide whether it contains substantial evidence from which the finder of fact could
> make the necessary finding beyond a reasonable doubt. We presume every inference
> in support of the judgment that the finder of fact could reasonably have made. We
> do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the
> judgment merely because the evidence could be reconciled with a contrary finding.
> [Fn.3.] (People v. D'Arcy (2010) 48 Cal.4th 257, 293.)

>> [Fn.3.] Mendoza frames his argument in terms of federal due process but
>> acknowledges that the standard for sufficient evidence under the federal
>> Constitution is identical to the standard under California law. (See People v.
>> Johnson (1980) 26 Cal.3d 557, 576 [California standard same as federal
>> Constitutional standard stated in Jackson v. Virginia (1979) 443 U.S. 307,

318–319].)

The evidence was sufficient to support the gang enhancements on counts 1 (murder) and 2 (discharging a firearm at a person from a motor vehicle) and the gang special circumstance for count 1. The evidence indicated that Mendoza was a Varrio Bakers member and Fernandez was a Colonia Bakers member. After a conflict between members of the groups with whom Mendoza and Fernandez came to the bar, Mendoza retrieved a gun and sought the support of another Varrio member for an expected conflict. Officer Shaff opined that the shooting of a gang member by a rival gang member under circumstances like these would be for the benefit of a gang. Having heard that gangs seek to fortify their reputations by resolving conflicts with rivals by force, the jury could reasonably conclude that the requirements of section 186.22, subdivision (b), and section 190.2, subdivision (a)(22), were satisfied.

Mendoza proposes an alternative, non-gang-related explanation for his behavior, which he says defeats both the section 186.22, subdivision (b), finding and the section 190.2, subdivision (a)(22), finding: After the conflict between Gabriel and the woman who threw the beer, Mendoza wanted "to protect the people he was with, none of whom were gang members." The basic facts of the case do not support the view that Mendoza acted to protect anyone when he shot Fernandez. Mendoza shot Fernandez hours after the conflict between Gabriel and the woman was over and as Mendoza and his group were leaving. Delarosa, Soto, and Sandra had already driven away in another car. There was no evidence that Fernandez did anything threatening as he approached the pickup truck.

In any event, the existence of a possible alternative to the conclusions accepted by the jury is not a reason to find the evidence insufficient. As we have said, we do not reverse a judgment just because the evidence could be reconciled with a different outcome.

Mendoza also maintains that the evidence was insufficient because Officer Shaff's opinion "was not coupled with other evidence that [Mendoza] fired the shot with the specific intent to benefit the Varrio Baker gang." We disagree. Shaff's opinion was supported by other evidence. The testimony of several witnesses showed that there was a conflict between the people accompanying Mendoza and the people accompanying Fernandez. Garduno's testimony supported the conclusion that Mendoza felt this situation merited a response by him as a gang member confronting a rival gang member. Mendoza sought out assistance and support for this confrontation from a fellow Varrio Bakers member, a man who was otherwise unknown to Mendoza and whom he had no non-gang reason to approach.

This case is thus unlike *People v. Albarran* (2007) 149 Cal.App.4th 214, 227, on which Mendoza relies, in which it was held that a gang motive was not shown because "the only evidence" supporting the view that the defendant acted to gain respect for his gang was "the fact of [the defendant's] gang affiliation." Here there was more. This case also is unlike *People v. Ramon* (2009) 175 Cal.App.4th 843, 851, on which Mendoza also relies, in which it was held that there were no facts to support a gang expert's opinion that the defendants acted to benefit a gang. There, the only facts were that the defendants were gang members and were stopped by police in their gang's territory. (*Id.* at p. 850.) Here, again, we have described circumstances supporting the enhancement that went beyond Mendoza's gang membership and the occurrence of the crime in rival gang territory.

We agree with Mendoza, however, that there was insufficient evidence to support the enhancement findings on counts 3 and 4, possession by a felon of a gun and

17

ammunition. The prosecution's evidence tied Mendoza to the stolen gun and the bullets found in Soto's garage; it also tied Mendoza and his gang to the shooting. It did not, however, tie the gun or the bullets to the shooting or Mendoza's gang membership to his possession of the gun or bullets. In effect, the People asked the jury to infer that if a gang member is found to have committed a gang-related offense with a gun, then any gun or ammunition subsequently found in the member's possession must have been possessed by him for a gang-related purpose. Without more, this inference cannot properly be made because nothing prevents a gang member from possessing a gun or ammunition for purposes independent of his gang status.

The People's very brief argument on this point relies on the following evidence: Garduno's testimony that Mendoza showed him a gun; the evidence that Mendoza used a gun to kill Fernandez for a gang purpose; and Shaff's testimony that shootings are a primary gang activity. For the reasons just stated, this evidence was insufficient to show that Mendoza possessed the gun and bullets found in Soto's garage to benefit his gang.

Perhaps the People could have proved that Mendoza possessed a gun and ammunition for a gang purpose on the date of the shooting, since he actually used a gun to commit a gang murder on that date. The People did not attempt to prove this, however. The information specifically charged Mendoza with gun possession on August 25, 2011—the date the gun was found in Soto's garage—not August 21, 2011, the date of the shooting.

The gang enhancements on counts 3 and 4 will be reversed.

Mendoza, 2015 WL 3399162, at *10-12.

        a.  Legal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326.

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

> b. Analysis

Petitioner contends that there was insufficient evidence to support the gang enhancement allegations that he committed the murder and discharged a firearm at a person from a motor vehicle to benefit a criminal street gang. He also contends that there was insufficient evidence to support the special circumstance allegation. For the sentence enhancements, Cal. Penal Code § 186.22(b)(1) requires the prosecution to prove that the defendant committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, . . . ." As to the special circumstance, Cal. Penal Code § 190.2(a)(22) requires the prosecution to prove that the "defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, . . . , and the murder was carried out to further the activities of the criminal street gang."

Viewing the evidence in the light most favorable to the prosecution, it is clear that the state court's determination that there was sufficient evidence was not unreasonable. It was established that Petitioner was a member of the Varrio Bakers criminal street gang. The victim was a member of the Colonia Bakers, a rival street gang. A conflict ensued between members of the party Petitioner arrived with and members of the rival gang. At one point, Petitioner elicited the help of a fellow gang member by making his own gang membership known. He then showed him a gun which he stated he would use in case of conflict. A gang expert, Officer Shaff, opined that the shooting of a gang member by a rival gang member in these circumstances would be for the benefit of the gang. From this evidence, a jury could conclude that the requirements of Cal. Penal Code §§ 186.22(b)(1) and 190.2(a)(22) were met.

In light of the above, Petitioner fails to show that no rational trier of fact would have agreed with the jury's determination. He fails to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, the <u>Jackson</u> standard. The claim should be denied.

4. <u>Cruel and Unusual Punishment</u>

Petitioner was sentenced to life without the possibility of parole, plus 25 years to life, plus 20 years. He contends this sentence, insofar as it necessarily exceeds his life span, constitutes cruel and unusual punishment under the Eighth Amendment.

Mendoza's sole argument in this appeal is that the sentence is cruel and unusual under article I, section 17 of the California Constitution and under the Eighth Amendment to the United States Constitution because it includes time notionally to be served after the term of life without the possibility of parole, and therefore is impossible for a human being to complete. Mendoza contends that a sentence of this type or a similar type (for instance, a determinate term over a hundred years) serves neither a retributive nor a deterrent purpose and exists only as a symbolic violation of a prisoner's dignity. The only authority he cites in support of these ideas is a dissenting opinion by Justice Mosk. (*People v. Hicks* (1993) 6 Cal.4th 784, 797 (dis. opn. of Mosk, J.); see also *People v. Deloza* (1998) 18 Cal.4th 585, 600–602 (conc. opn. of Mosk, J.).) He asks us to exercise our discretion to address this argument even though it was not raised in the trial court, and to adopt a constitutional doctrine like that supported by Justice Mosk. Mendoza argues that it would have been futile to raise the issue in the trial court and acknowledges that we are under no obligation to accept a position supported only by a single justice's non-majority opinions.

We will exercise our discretion to consider the issue, but we are not persuaded that a judge-made rule against sentences like Mendoza's would be appropriate. The sentencing schemes employed in this case were created by the Legislature and the

20

voters. These schemes can impose additional time beyond a sentence lasting a prisoner's entire remaining life, but their capacity to do this does not impair any concrete interest of the prisoner, who will in reality serve a life term. Further, contrary to Mendoza's argument, we cannot say the imposition of the additional years is unconstitutional because it has no purpose. For instance, it might be said to have a purpose in vindicating the dignity of victims, or it could be justified in terms of avoiding the administrative burden that would be added if it were necessary to modify all multiple-count sentences in which the terms otherwise authorized by law add up to more than a human lifespan. These are only examples; other possible purposes might be adduced as well. (See, e.g., *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 [sentence of 444 years to life plus 115 years served purpose of expressing society's condemnation of defendant's crimes].)

We do not mention these possible justifications to endorse them. Instead, the point is that under circumstances like these, we do not construe our constitutional authority to support remaking the law. Mendoza's argument would more appropriately be addressed to the voters or the Legislature.

Our holding is consistent with the rejection of similar arguments in *People v. Byrd, supra*, 89 Cal.App.4th at pp. 1382–1384, and *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1134–1137.)

Mendoza, 2017 WL 372031, at *3–4.

### a. Legal Standard and Analysis

The Eighth Amendment provides that cruel and unusual punishments shall not be inflicted. U.S. Const. amend. VIII. A sentence constitutes cruel and unusual punishment if it is "grossly disproportionate" to the crimes committed. Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (holding that a California state court's affirmance of two consecutive twenty-five-years-to-life sentences for petty theft was not grossly disproportionate and not contrary to nor an unreasonable application of federal law); see also Ewing v. California, 538 U.S. 11 (2003) (holding that a sentence of twenty-five-years-to-life for theft under California's three strikes law was not cruel and unusual punishment); Harmelin v. Michigan, 501 U.S. 957, 961 (1991) (mandatory sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality); Rummel v. Estelle, 445 U.S. 263, 271 (1980).

Outside of the capital punishment context, the Eighth Amendment prohibits only sentences that are extreme and grossly disproportionate to the crime. United States v. Bland, 961 F.2d 123, 129 (9th Cir.1992) (quoting Harmelin, 501 U.S. at 1001). When reviewing an Eighth Amendment claim in a federal habeas corpus petition, the gross disproportionality principle is "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable

application of' framework" under 28 U.S.C. § 2254(d)(1). <u>Lockyer</u>, 538 U.S. at 73.  The "gross disproportionality rule" applies "only in the 'exceedingly rare' and 'extreme' case."  <u>Lockyer</u>, 538 U.S. at 72–73; <u>Rummel</u>, 445 U.S. at 272.  So long as a sentence does not exceed statutory maximums, it will not be considered cruel and unusual punishment under the Eighth Amendment.  <u>See</u> <u>United States v. Mejia–Mesa</u>, 153 F.3d 925, 930 (9th Cir.1998); <u>United States v. McDougherty</u>, 920 F.2d 569, 576 (9th Cir.1990).

In assessing the compliance of a non-capital sentence with the proportionality principle, a reviewing court must consider "objective factors" to the extent possible.  <u>Solem</u>, 463 U.S. 277, 290 (1983).  Foremost among these factors are the severity of the penalty imposed and the gravity of the offense.  <u>Id</u>. at 290–91.  If "a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality," the reviewing court should compare the sentence with sentences imposed on other criminals in the same jurisdiction and for the same crime in other jurisdictions.  <u>Harmelin</u>, 501 U.S. at 1005.  "Comparisons among offenses can be made in light of, among other things, the harm caused or threatened to the victim or society, the culpability of the offender, and the absolute magnitude of the crime."  <u>Taylor</u>, 460 F.3d at 1098.  If a comparison of the crime and the sentence does not give rise to an inference of gross disproportionality, a comparative analysis is unnecessary.  <u>Id</u>.

There is no Supreme Court authority for Petitioner's contention that a term which could not possibly be served in a lifetime constitutes cruel and unusual punishment. Thus, the state court's decision cannot be found to be contrary to or an unreasonable application of clearly established Supreme Court authority. Moses, 555 F.3d at 754. Even if the Court were to construe the claim as raising a gross disproportionality argument, the Court finds no inference of gross disproportionality from the present record.  Petitioner was convicted of first-degree murder with special circumstance. He had an extensive criminal history including multiple prior convictions for serious or violent offenses.  Nothing in the record creates an inference of gross disproportionality.

Accordingly, the state court determination that Petitioner's sentence did not constitute cruel and unusual punishment was not contrary to or an unreasonable application of Supreme

1    Court precedent.  The claim should be rejected.

2    **IV.    RECOMMENDATION**

3           Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be

4    DENIED with prejudice on the merits.

5           This Findings and Recommendation is submitted to the United States District Court Judge

6    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

7    Local Rules of Practice for the United States District Court, Eastern District of California.  Within

8    twenty-one days after being served with a copy of this Findings and Recommendation, any party

9    may file written objections with the Court and serve a copy on all parties.  Such a document

10   should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

11   to the Objections shall be served and filed within ten court days (plus three days if served by

12   mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling

13   pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections

14   within the specified time may waive the right to appeal the Order of the District Court.  Martinez

15   v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16

17   IT IS SO ORDERED.

18   Dated:    **May 6, 2019**                          /s/ _Sheila K. Oberto_

19                                                  UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28